Commonwealth, Appellant, v. Thomas.

640

Argued April 18, 1955. Before STERN, C. J., STEARNE, JONES, BELL, CHIDSEY, MUSMANNO and ARNOLD, JJ.

*Victor Wright*, Assistant District Attorney, with him *Samuel Dash*, First Assistant District Attorney, and *Richardson Dilworth*, District Attorney, for appellant.

*Garfield W. Levy*, with him *Donald J. Goldberg* and *Harry M. Berkowitz*, for appellee.

OPINION BY MR. JUSTICE ARNOLD, September 26, 1955:

The Commonwealth appeals from the judgment of the court below sustaining the defendant's demurrer to the Commonwealth's evidence in the trial of defendant upon an indictment for murder.

For the purposes of this appeal, the following are the pertinent agreed facts: Defendant and one Henry

Jackson, Jr., the deceased, entered the grocery store of one Cecchini and ordered him to open the cash drawer. Jackson was armed with a revolver which he displayed to Cecchini. The defendant removed the money, and he and Jackson ran from the store,—Jackson running one way and defendant the other. Cecchini secured his own pistol and chased Jackson. In the exchange of shots Cecchini killed Jackson. Defendant escaped, but was later apprehended.

The sole question is whether defendant can be convicted of murder under this state of facts. That is, can a co-felon be found guilty of murder where the victim of an armed robbery justifiably kills the other felon as they flee from the scene of the crime?

Our Penal Code of 1939, P. L. 872, 18 PS §4701, provides: "All murder . . . which shall be committed in the perpetration of any . . . robbery . . . shall be murder in the first degree . . ." The Code does not define "murder," but merely fixes the degree of the crime. In *Commonwealth v. Drum,* 58 Pa. 9, 15, it was said: "At the common law murder is described to be, when a person of sound memory and discretion unlawfully kills any reasonable creature in being . . ., with malice aforethought, expressed or implied. The distinguishing criterion of murder is malice aforethought. But it is not malice in its ordinary understanding alone, a particular ill-will, a spite or a grudge . . . It comprehends not only a particular ill-will, but every case where there is wickedness of disposition, hardness of heart, cruelty, *recklessness of consequences, and a mind regardless of social duty, although a particular person may not be intended to be injured.*" (Italics supplied).

In applying the felony-murder statute, we have held that the malice of the initial offense attaches to whatever else the criminal may do in connection therewith. "It makes no difference that [the defendant] . . . and

the other conspirators could not know in advance the precise course of events that would follow when they attempted to complete their evil designs": *Commonwealth v. Guida*, 341 Pa. 305, 310, 19 A. 2d 98.

If the defendant sets in motion the physical power of another, he is liable for its result. "Acts should be judged by *their tendency under the known circumstances*, not by the actual intent which accompanies them . . . the law requires [men] at their peril to know the teachings of common experience, just as it requires them to know the law . . . 'the test of murder is the degree of danger to life attending the act under the known circumstances of the case' " . . . " 'He whose act causes in any way, directly or indirectly, the death of another, kills him, within the meaning of the law of felonious homicide. It is a rule both of reason and the law that whenever one's will *contributes to impel a physical force, whether another's, his own, or a combined force, proceeding from whatever different sources, he is responsible for the result, the same as though his hand, unaided, had produced it . . .'* " "There can be no doubt about the 'justice' of holding that felon guilty of murder in the first degree who engages in a robbery or burglary and thereby inevitably calls into action defensive forces against him, the activity of which forces result in the death of a human being": *Commonwealth v. Almeida*, 362 Pa. 596, 605, 629, 68 A. 2d 595.

As has been said many times, such a rule is equally consistent with reason and sound public policy, and is essential to the protection of human life. The felon's robbery set in motion a chain of events which were or should have been within his contemplation when the motion was initiated. He therefore should be held responsible for *any death* which by direct and almost inevitable sequence results from the initial criminal act.

"For any individual forcibly to defend himself or his family or his property from criminal aggression is a primal human instinct. It is the right and duty of both individuals and nations to meet criminal aggression with effective countermeasures. Every robber or burglar knows when he attempts to commit his crime that he is inviting dangerous resistance . . . knows that a likely later act in the chain of events he inaugurates will be the use of deadly force against him on the part of the selected victim. *For whatever results follow from that natural and legal use of retaliating force, the felon must be held responsible*": *Commonwealth v. Moyer,* 357 Pa. 181, 191, 53 A. 2d 736. (Italics supplied).

The driver of a get-away car is guilty of murder in the first degree where the killing was committed by his accomplices in the course of robbery: *Commonwealth v. Lowry,* 374 Pa. 594, 98 A. 2d 733.

In *Commonwealth v. Doris,* 287 Pa. 547, 135 A. 313, we sustained a conviction of a co-felon for murder in the first degree, even though after the robbery was completed and the conspirators were trying to effect their escape, defendant's accomplice shot and killed a police officer, at which time defendant was already in the custody of and restrained by police officers.

In *Commonwealth v. Moyer,* supra, we held that it was immaterial whether the bullet killing a third person (police officer) came from the defendant's pistol or that of the victim of the robbery.

In *Commonwealth v. Bolish,* 381 Pa. 500, 113 A. 2d 464 (reversed on other grounds), we held a conviction of murder in the first degree to be proper even though defendant's accomplice (in arson) actually set the fire which caused his own death. The defendant there contended that the accomplice's act was an intervening and superseding force relieving the defendant of the

killing. We there said: "Courts have a duty, especially in these days when crime has become so prevalent, to see that the lives, the property and the rights of law-abiding people are protected and consequently must delicately balance the scales of justice so that the rights of the public are protected equally with those of persons accused of crime. An arsonist is bound to know the perils and natural results of a fire which are reasonably foreseeable according to the common experience of mankind, and in particular to know that an occupant of the building set on fire, *an accomplice,* a fireman and the public who are likely to come to watch the fire, may die in or as a natural proximate result of the fire. The attempt of an officer or person to put out the fire, or to rescue people or property therein, or the attempt of any person to escape from the burning building does not constitute in legal contemplation a superseding cause which is sufficient to relieve the arsonist from murder in the first degree. In reason, logic and principle we can see no valid distinction between those cases and a case where an accomplice is killed while setting fire to a house (or building) or attempting to escape therefrom,—the latter's death is just as readily foreseeable as is the death of an owner who attempts to escape or to rescue lives or property from the building." (Italics supplied) In the *Bolish* case the co-felon's death was the unintentional result of his own acts (of arson), without the intervention of a third person or of the defendant.

So, too, in the instant case. That the victim, or any third person such as an officer, would attempt to prevent the robbery or to prevent the escape of the felons, and would shoot and kill one of the felons was "as readily foreseeable" as the cases where an innocent bystander is killed, even unintentionally, by the defendant's accomplice, or where the victim of the rob-

bery is slain, or where a pursuing officer is killed. The killing of the co-felon is the natural foreseeable result of the initial act. The robbery was the proximate cause of the death. We can see no sound reason for distinction merely because the one killed was a co-felon. It was a killing in the perpetration of a robbery which was "unquestionably contemplated and callously ignored by the defendant, who most certainly intended to commit a crime which he knew might well give rise to it": *Commonwealth v. Sterling*, 314 Pa. 76, 80, 170 A. 258.

So far as this defendant is concerned, the justification or excuse of the actual slayer, for the killing under consideration, is no different than for the killings in the cases hereinbefore cited.[1]

Judgment reversed and new trial ordered.

---

CONCURRING OPINION BY MR. JUSTICE BELL:

Jackson and defendant attempted to hold up and rob a grocery store; the owner shot and killed Jackson. Can defendant be found guilty of murder under those facts?

The modern and most accurate definition of murder is thus stated in *Commonwealth v. Bolish*, 381 Pa. 500, 510, 113 A. 2d 464: "Murder is defined as an unlawful killing of another with malice aforethought, express or implied."[*]  Malice, express or implied, it is universally agreed, is the *trade-mark* of murder.

---

[1] See "A Survey of Felony Murder" by Frederick C. Moesel, Jr., 28 Temple Law Quarterly, page 453.

[*] This was a reiteration of the definition of murder laid down in *Commonwealth v. Buzard*, 365 Pa. 511, 516, 76 A. 2d 394. The definition of murder in *Commonwealth v. Drum*, 58 Pa. 9, 15, is today out-moded and confusing in that it would seemingly require the Commonwealth to prove that the accused was "a person of

Where a killing occurs in the commission of a robbery malice is implied and the felony murder doctrine applies—all authorities, ancient, modern, case and text agree and both of the dissenting opinions admit—*to unintentional and accidental* killings which are the natural and reasonably foreseeable result of the robbery: Book IV Blackstone Commentaries, §§192-193, page 1589; §§200-201, pages 1598-99; *Commonwealth v. Bolish*, 381 Pa., supra, pages 510, 520, and the numerous cases and text authorities cited therein. If we analyze how such a killing can (and does) amount to murder, it will aid us in solving the question involved in the instant case. The reason is that (a) any person committing any common law felony or one of the enumerated statutory felonies, possesses a malevolent state of mind which the law calls "malice"; and (b) malice is present in the felon (or felons) actually or by legal implication not only at the time of the original felony but also at the time of the killing; and (c) such person is from time immemorial responsible for the natural and reasonably foreseeable results of the felony. *Commonwealth v. Bolish*, 381 Pa., supra; *Commonwealth v. Almeida*, 362 Pa. 597, 68 A. 2d 595; *Commonwealth v. Guida*, 341 Pa. 305, 308, 19 A. 2d 98; *Commonwealth v. Lessner*, 274 Pa. 108, 112, 118 A. 24; IV Blackstone Commentaries, §§200-201, page 1599; Clark & Marshall "Crimes", 4th Ed., §245, page 298.

Justice JONES and Justice MUSMANNO *admit that the felony murder doctrine is part and parcel of the common law* but believe that the felony murder doctrine should not apply where the killing is (so-called) "justifiable".

---

sound memory and discretion" and that the victim was a "reasonable" creature.

Justice JONES states: "I am at a loss to understand how anyone can be guilty of murder at common law for . . . a justifiable homicide." We might fairly ask the analogous question: If Justice JONES is correct, "How can anyone be guilty of murder [as *all* authorities agree they can] for an accidental or an unintentional homicide?"* How is it possible to draw a logical or realistic or sound or legal distinction—so far as the crime of murder is concerned—between an unintentional or accidental killing in the perpetration of a robbery and (what the minority calls) a justifiable killing in the perpetration of a robbery? Another point overlooked by the minority is that the killing of a robber may be (and usually is) a justifiable killing so far as the intended victim or a police officer is concerned, but that does not make it a justifiable killing qua the co-felon who caused the shooting.

Felony-murder, like malice, which is the sine qua non of murder, is a creation of the law. Its origin is shrouded in antiquity. The reason for its origin, development and application to modern conditions was and is *"the protection of society"*. Malice is a malignant state of mind—a mind filled with a wicked malevolent intent to commit, singly or with others, a felony which, according to the experience of mankind, will naturally and likely result in the killing of some

---

* A person who commits an excusable homicide (for example, self-defense), or an accidental or unintentional homicide (where no malice exists), or a justifiable homicide (where no malice exists, as for example, a jailer executing a murderer sentenced to death), is not guilty of murder or of any felony under the law of Pennsylvania; but an accidental killing or an unintentional killing or a justifiable killing of a felon or of the proposed victim of the felony or of a police officer or of an innocent bystander, if committed during the perpetration of one of the enumerated statutory felonies, constitutes, under the authorities of Pennsylvania, murder in the first degree.

person. It is the parent as well as an integral part of felony murder—they both were firmly imbedded in the common law and are centuries old. Without the application of the felony murder doctrine or principle, an unintentional or accidental killing in a hold-up could not amount to common law murder. Malice is obviously just as much *present in the felon or felons* in a so-called justifiable killing which occurs in a robbery, as in an accidental or unintentional killing which occurs in a robbery. Consequently, if the killing occurred in a robbery, what does it matter who fired the fatal shot or who was killed?

It is interesting and relevant to note that the two dissenting Justices differ as to what is and what is not a justifiable killing. Justice MUSMANNO believes that the felony murder doctrine applies if the person killed was an innocent person, irrespective of who fired the fatal shot; but it does not apply if the person killed was one of the robbers, since killing a robber while he or an accomplice is committing a robbery is justifiable. Justice JONES, on the other hand, apparently believes that the felony murder doctrine applies only if the defendant or *one* of the robbers fired the fatal shot and that in such an event it does not matter who was killed.

Isn't the distinction made by Justice JONES and by Justice MUSMANNO a distinction without any justifiable or legal difference since, we repeat, the malignant state of mind which the law calls "malice" is present in each felon in a so-called justifiable killing just as much as in an accidental or an unintentional killing and in each case the killing was the natural and reasonably foreseeable result of the felony? Furthermore, doesn't each of these attempted distinctions ignore sound public policy as well as the theory and application of the doctrine of "implied malice" and "felony murder"?

Moreover, Justice JONES'S present view appears to be *diametrically different from and inconsistent with* (that part of) the standard or test (which is presently relevant) adopted by him in his carefully considered dissenting opinion in *Commonwealth v. Almeida,* 362 Pa., supra, where he said (page 643) : "The jury should have been instructed that, in order to find the defendant guilty of murder, it was not only necessary for them to find the killing to have been coincidental with the perpetration of a felony in which the defendant was at the time participating but that they would *also* have to find that the fatal shot was fired by one of the felons *or, if not fired by one of them, that the conduct of the defendant or his accomplices set in motion a chain of events among whose reasonably foreseeable consequences was a killing such as actually occurred.*"[*]

In the light of that "reasonably foreseeable consequences" test, which was the same (common law) test laid down by the majority opinion in *Commonwealth v. Almeida,* and followed by this Court ever since *Almeida,* isn't his present position inexplicable?

There is, in my judgment, no reason, principle or justice to support the distinction drawn by the minority; and even more important, the Courts of Pennsylvania—after an exhaustive consideration of all the theories and contentions which have been advanced by the minority in this case—have clearly, specifically and unequivocally ruled to the contrary.

Because a man's life is at stake and because of the importance of the felony murder doctrine, it is wise to consider the theories and propositions advanced by the minority—even though they have been repeatedly rejected by the Supreme Court of Pennsylvania—and

---

[*] Italics throughout, mine.

to re-examine the decision in the *Almeida* case* and what the law of Pennsylvania was *prior to Almeida,* and what it has been ever *since Almeida.*

Justice JONES erroneously premises his present dissenting opinion with the statement (a) that the only murder known to the law of Pennsylvania is (with the exception of the wanton derailment of a railroad train: Section 919 Penal Code of 1939, P. L. 872) common law murder, i.e., murder as it existed under the common law of England; and (b) that the majority opinion extends *Commonwealth v. Almeida,* which over-extended the felony murder doctrine, and that such an extension is unjustifiable. We are convinced that those statements are neither accurate nor correct.

Murder in Pennsylvania includes a killing in the perpetration of a common law felony *and also* a killing in the perpetration of certain enumerated statutory felonies which were *unknown to the common law* such as statutory arson, statutory rape, statutory burglary, and kidnapping, which was a common law misdemeanor: See, Penal Code of 1939, §701; *Commonwealth v. Maloney,* 365 Pa. 1, 11, 73 A. 2d 707; *Commonwealth v. Carey,* 368 Pa. 157, 82 A. 2d 240; and *Commonwealth v. Bolish,* 381 Pa., supra.

### The Almeida Case

*Commonwealth v. Almeida* is legally on all-fours with the instant case and directly rules it. This Court decided in the *Almeida* case that where an officer was killed by a fellow officer while attempting to prevent the escape of the robbers, *all of the robbers were guilty*

---

* We note parenthetically that it represented the conviction of six members of the Supreme Court of Pennsylvania, after a thorough and exhaustive consideration, discussion and review of a myriad of cases and of principles of homicide as enunciated over the centuries by text authorities and judicial decisions, and it has since been affirmed three times by this Court.

*of murder in the first degree, even though the fatal shot was fired by a policeman or by an innocent bystander.* The principal contention of the defendant in that case was that he could not be convicted of murder unless he fired the fatal shot. All of the minority's contentions in the instant case are fully answered in the exhaustive and convincing 38 page Opinion of Chief Justice MAXEY in the *Almeida* case. From that opinion we quote the following (pages 600-602, 603-604, 605, 607):

"The Commonwealth contends that . . . it is immaterial whether the bullet was fired by one of them [i.e., the three robbers] or whether it was fired by one of the policemen in repelling the assault of the bandits and in attempting to frustrate their escape.

"The defendant's first assignment of error is that the court charged the jury as follows: '. . . it makes no difference who fired the shot, even if a shot was fired by Mrs. Ingling it was murder.' Defendant's second assignment of error is based on the *court's refusal* to affirm defendant's thirteenth point for charge, which reads as follows: 'If you find that the bullet which was fired and killed the deceased was not fired by any one of the three men charged with perpetrating the robbery in question, you cannot convict the defendant of murder in the first degree.'

". . .

" '. . . I will charge the jury that it makes no difference who fired the shot, even if a shot was fired by Mrs. Ingling, it was still murder.'*

---

* In Pennsylvania it is not necessary that defendant fire the fatal shots; a look-out or the driver of a get-away car or an accomplice is liable for murder equally with the felon who did the actual killing: *Commonwealth v. Lowry*, 374 Pa. 594, 98 A. 2d 733; *Commonwealth v. Robb*, 284 Pa. 99, 130 A. 302; *Commonwealth v. Micuso*, 273 Pa. 474, 117 A. 211; *Weston v. Commonwealth*, 111

"In his charge the trial judge said: *'If that [fatal] shot were fired by anyone, even anyone removed from these three participants, and that shot was fired in the perpetration of robbery,* members of the jury, that is murder; *that is murder in the first degree.* . . . If one or more persons set in motion a chain of circumstances out of which death ensues, those persons must be held responsible for any death which by direct, by almost inevitable sequence, results from such unusual criminal act. . . . So, if the death of Officer Ingling was the inevitable consequence of the unlawful act, or acts, of the defendant, or the continuation of the unlawful act, or acts, of the defendant, acting in concert—for every one who does an unlawful act is considered by law as the doer of all that follows—if that unlawful act be robbery, and if the result of that act is a killing, members of the jury, that killing is murder.'

"The defendant's thirteenth point for charge which the trial judge correctly rejected was in effect a request that the court instruct the jury that in order to convict the defendant of the death of Officer Ingling, the jury would have to find that the fatal shot was fired by one of the three robbers. *Such an instruction would have been in defiance of this Court's decision in Commonwealth v. Moyer* and Commonwealth v. Byron, 357 Pa. 181, 53 A. 2d 736, which decision the trial judge dutifully followed. In that decision handed down on June 30, 1947, this Court held in an opinion concurred in by the six judges who heard the argument on appeal, that: *'A man or men engaged in the commission of such a felony as robbery can be convicted of murder in the first degree if the bullet which causes*

Pa. 251, 2 A. 191; *Commonwealth v. Biddle,* 200 Pa. 640, 50 A. 262; *Commonwealth v. Doris,* 287 Pa. 547, 135 A. 313; *Commonwealth v. Byron,* 357 Pa. 181, 53 A. 2d 736; *Commonwealth v. Phillips,* 372 Pa. 223, 93 A. 2d 455.

*death was fired not by the felon but by the intended victim in repelling the aggressions of the felon or felons.* . . . when a felon's attempt to commit robbery*

---

* Justice MUSMANNO admits that *Commonwealth v. Almeida* was correctly decided. Justice JONES seeks to undermine it by stating that it was based on "a palpable dictum as an examination of the record in the *Moyer* and *Byron* case will at once disclose". Contrary to Justice JONES's opinion, the record in that case demonstrates and this Court in the *Almeida* case explicitly held that the aforesaid statement was not a dictum. The record in *Commonwealth v. Moyer and Byron* reads as follows: "ASSIGNMENTS OF ERROR. . . . 2. The appellants respectfully assign for error the charge of the Court. . . . 'We have made a distinction between intent to kill and that which is done in the perpetration of a robbery. That in itself is sufficient and that is the ruling of the Supreme Court on that particular question which we have submitted to you. All of the participants in an attempted robbery are guilty of murder in the first degree if someone is killed in the course of the perpetration of the first-named crime. That is the law of the Commonwealth of Pennsylvania.' "

On the question of dictum, Chief Justice MAXEY said (page 603) : "The factual issue the defendant raises in this case is identical with the factual issue raised by the defendants in Commonwealth v. Moyer and Byron, supra; to wit, who fired the fatal bullet—one of the robbers or a man who was lawfully resisting the criminal attack of the robbers? The legal question presented and decided in the Moyer-Byron case was precisely the legal question raised in the instant case; to wit, when men who are feloniously shot at by robbers return their fire in self-defense and a third person is killed by a shot fired by the defenders, are the robbers whose felonious action caused the shooting guilty of murder? In the Moyer-Byron case this Court after a thorough discussion of that question decided that under the facts of that case, 'The Moyer-Byron felonious invasion of the Shank gas station on July 13, 1946, was likewise the proximate cause of the resultant fatality.' (191 of 357 Pa.) That was not dictum but authority. 'Whenever a question fairly arises in the course of a trial, and there is a distinct decision thereon, the court's ruling in respect thereto can in no sense be regarded as mere "dictum".' New York Cent. & H. R. R. Co. v. Price, 159 F. 330, 332, 86 C.C.A. 502, 16 L.R.A., N.S., 1103. . . .

or burglary sets in motion a chain of events which were or should have been within his contemplation when the motion was initiated, he should be. held responsible for any death which by direct and almost inevitable sequence results from the initial criminal act. . . . Every robber or burglar knows when he attempts to commit his crime that he is inviting dangerous resistance. . . . If in fact one of the bullets fired by Earl Shank in self-defense killed Harvey Zerbe, [an innocent bystander], the responsibility for that killing rests on Moyer and his co-conspirator Byron, who had armed themselves with deadly weapons for the purpose of carrying out their plan to rob Shank and whose murderous attack made Shank's firing at them in self-defense essential to the protection of himself and his employees and his property.'

" . . .

"Justice HOLMES in his book on 'The Common Law', (36th Ed.) pp. 56 and 57, said: Acts should be judged by their tendency under the known circumstances, not by the actual intent which accompanies them. . . . 'the object of the law is to prevent human life being endangered or taken. . . . the law requires [men] at their peril to know the teachings of common experience, just as it requires them to know the law. . . . the test of murder is the degree of danger to life attending the act under the known circumstances of the case.'

". . . The felonious acts of the robbers in firing shots at the policemen, well knowing that their fire

Our decision in Commonwealth v. Moyer and Byron, supra, is authority for our decision in this case."

We agree with Chief Justice MAXEY and his colleagues that Commonwealth v. Moyer and Byron, clearly ruled the Almeida case and that the specific ruling to that effect was not dictum nor was it an extension of the principles of the common law felony murder doctrine.

would be returned, as it should have been, was the proximate cause of Officer Ingling's death."

The Court then (1) carefully analyzed and rejected all of the theories and contentions which are now made on behalf of the present defendant (Thomas); and (2) likewise analyzed and distinguished or rejected all of the authorities upon which Justice JONES relies in his dissenting opinion in the present case; and (3) reviewed and approved many cases from our sister States which were in accord with the majority opinion in *Almeida*.

In view of the present state of the law in this Commonwealth the question of whether (as Justice JONES contends) *Almeida* extended the felony murder doctrine or whether it had any prior decision of this Court to support it, is certainly academic. However, I agree with the six Justices in the *Almeida* case *who were of the contrary opinion* and specifically held that the cases of *Commonwealth v. Moyer and Byron* and *Commonwealth v. Almeida* were factually and legally precisely the same and then said, inter alia, (pages 603-604): "Our decision in the *Moyer-Byron* case was *an application of the long established principle* that he whose felonious act is the proximate cause of another's death is criminally responsible for that death and must answer to society for it exactly as he who is negligently the proximate cause of another's death is civilly responsible for that death and must answer in damages for it." That long established principle is equally applicable to the present case.

The principle that a person is liable *for the natural and reasonably foreseeable consequences* of his act did not originate with *Commonwealth v. Almeida*—it is centuries old. "If one intends to do another felony and undesignedly kills a man this is also murder. If one shoots at A and misses him, but kills B, this is mur-

der, because of the previous felonious intent which the law transfers from one to the other": Blackstone's Commentaries, Book IV, §§200-201, page 1599.

The famous "Squib Case"—*Scott v. Shepherd,* 2 William Blackstone Reports 892 (1773) is another illustration of this ancient doctrine. In that case Shepherd, the defendant, tossed a lighted squib into a marketplace. It fell near A who, reacting naturally in accordance with the common experience of mankind, picked it up and tossed it away from him. It fell near B, who likewise picked it up and threw it away from him; unintentionally and solely by chance it hit Scott in the face and destroyed one of his eyes. Scott was allowed to recover from Shepherd for the loss of his eye, since Shepherd's original unlawful act would, according to the common experience of mankind, naturally result in injury to another person. In other words, Shepherd's unlawful act started a chain reaction, the natural result of which was injury to Scott.

Isn't it clear as crystal in reason, principle and authority, that the natural and reasonably foreseeable result of an attempted robbery—according to the common experience of mankind—is the shooting and killing of a human being—either a potential victim or an officer of the law or an innocent bystander or one of the robbers!*

To summarize: (1) *Commonwealth v. Almeida,* which was wisely decided in accordance with sound

---

*Ancient and modern text authorities, sound public policy and prior decisions of this Court support and justify the majority opinion. If Justice JONES is correct that the felony murder doctrine can be applied to the present facts only by an act of the legislature, common law or judge-made law could never be interpreted, expounded or extended or a conviction obtained thereunder if a case exactly on its facts had never been previously decided. This same argument was made and specifically rejected in *Commonwealth v. Almeida,* 362 Pa., at pages 628 and 629.

public policy and long and well established principles of law, *clearly and directly rules the instant case;* (2) it has been reaffirmed and cited or quoted with approval by this Court in *Commonwealth v. Bolish,* 381 Pa., supra, pages 515-519; *Commonwealth v. Phillips,* 372 Pa. 223, 228, 93 A. 2d 455; and *Commonwealth v. Lowry,* 374 Pa. 594, 599, 98 A. 2d 733; and (3) it has become the well settled law of this Commonwealth.

In *Commonwealth v. Bolish,* 381 Pa., supra, this Court held that the felony murder doctrine applied where the defendant planned an arson and his accomplice or dupe was killed in the ensuing fire, and said (page 520): "We may thus summarize what has become the settled law of Pennsylvania:\* *If a person with legal malice commits an act or sets off a chain of events from which, in the common experience of mankind, the death of another is a natural or reasonably foreseeable result, that person is guilty of murder, if death results from that act or from the events which it naturally produced.* If the original malicious act was arson, rape, robbery, burglary or kidnapping, the original actor is guilty of murder in the first degree."

And Justice JONES himself recognized this test or standard in *Commonwealth v. Almeida* where he asserted the true test in felony murder cases was as follows (page 643): "The jury . . . would . . . have to find . . . that the fatal shot was fired by one of the felons, or if not fired by one of them, that *the conduct of the defendant or his accomplices set in motion a chain of events among whose reasonably foreseeable consequences was a killing such as actually occurred.*" In the light of that carefully considered statement of the

---

\* See also the authorities set forth in *Commonwealth v. Moyer and Byron; Commonwealth v. Almeida;* and *Commonwealth v. Bolish.*

law, how can anyone justify his present contradictory opinion?

How often, may we ask, must a Court state or expound important principles before they become stare decisis? As Lord Coke, Chief Justice of England, wisely said: "The knowne certaintie of the law is the safetie of all." Such a principle makes for certainty and stability; an utter disregard for precedents or a changing of the rules to meet. the exigencies of each case as it arises, or any other similar principle produces uncertainty and confusion and brings the Law and the Courts into disrepute. See Opinion of Justice OWEN J. ROBERTS in *Smith v. Allwright,* 321 U. S. 649, page 669, 88 L. Ed. 987, 1000.

### The Law of our Sister States

Justice JONES also contends that we should change the well settled law of Pennsylvania because four out of forty-seven of our sister States have refused to include justifiable homicide under the felony murder doctrine. The opinions of the highest Courts in our sister States are entitled to careful consideration, but we reserve the same right which we accord to them, namely, to agree with them when we believe they are sound and to differ with them when we believe they are unsound. In the instant case the dissenting opinions have failed to note that the prior Pennsylvania cases upon which they rely were .carefully analyzed and distinguished, and the decisions they now cite from other States were distinguished or disapproved by this Court in *Commonwealth v. Almeida.* Furthermore, that exhaustive opinion cites, quotes. and discusses many decisions .of this Court and of the Courts of our sister States which support that opinion and the subsequent decisions of this Court.

We must not turn back the clock. If there could be any reasonable doubt as to the meaning and applica-

tion of the felony murder doctrine, it should not be restricted by hair-splitting technicalities or illogical or unrealistic distinctions, the sole and inevitable effect of which is to absolve murderous robbers from the killings which are the natural and likely result of their felonious hold-ups. For the protection and welfare of the people of this Commonwealth, the public and the Courts must stop coddling criminals, young as well as old, otherwise the terrible brutal crime wave which is sweeping our State and Country will never be halted.

---

DISSENTING OPINION BY MR. JUSTICE JONES:

I am at a loss to understand how anyone can be found guilty of murder at common law for a killing that, unquestionably, was a justifiable homicide. Yet, that is precisely the eventuality which the court's decision in this case portends.

On the basis of imputed malice, drawn from the defendant's participation in a robbery, he is held to be answerable to a charge of murder for the killing of his confederate by the victim of their robbery. The consequence thus arrived at is a further and, to my mind, wholly unwarranted extension of the felony-murder doctrine. The opinion for the court relies, for its principal authority, on the decision in *Commonwealth v. Almeida*, 362 Pa. 596, 68 A. 2d 595; it also cites the more recent case of *Commonwealth v. Bolish*, 381 Pa. 500, 113 A. 2d 464. But, the *Bolish* case is plainly distinguishable from *Almeida*, and the instant case is equally distinguishable from both.

The decision in the *Almeida* case was *sui generis*. It was a judicial departure from common law criminal jurisprudence. A review of authorities will readily so confirm. The ruling in the *Almeida* case should not,

therefore, be extended by still further judicial enlargement. The only constitutional power competent to define crimes and prescribe punishments therefor is the legislature, and courts do well to leave the promulgation of police regulations to the people's chosen legislative representatives. No killing under circumstances such as this case presents has ever heretofore been declared murder in Pennsylvania.

The facts of the instant case are few and undisputed. Without doubt, they would support a criminal charge against the defendant Thomas but *not for murder*. With his companion, Jackson, Thomas conspired to, and did, rob the grocery store of one Cecchini. Jackson who was armed, kept Cecchini covered with his gun while Thomas rifled the cash register. When they had finished their nefarious plot they rushed from the store and, reaching the street, ran in opposite directions. Cecchini, grabbing a revolver from under the counter, gave chase and engaged in an exchange of gun fire with Jackson with the result that Jackson was mortally wounded by a bullet fired by Cecchini. The record does not show that Thomas was armed at the time of the killing, but whether he was or not is presently immaterial. He was a willing participant in an armed robbery whereof he could be charged and found guilty at common law (*Commonwealth v. Moore*, 121 Ky. 97, 88 S.W. 1085) and more recently under a pertinent statute of this State. But, Thomas is not chargeable, under any known rule of relevant law, with murder for the death of his co-felon. It is the common law alone which defines murder in Pennsylvania. It is obvious, therefore, that in re-examining the felony-murder doctrine, both as to its origin and development and its application in Pennsylvania as well as in other common law jurisdictions, it is to be fixed firmly in mind that there is no statutory crime of mur-

der in Pennsylvania save for one special and presently irrelevant mode of death-dealing.[1]

The so-called murder statute of this State is but a categorizing of common law murder into two degrees —a division still unrecognized in England whence the definition of murder as applied in this State was derived. The fact is that the legislature of Pennsylvania was the first to divide the crime of murder into degrees (see Section 2 of the Act of April 22, 1794, P. L. 186). Since then, most of the other States of the Union have adopted similar statutes. See Keedy, *History of the Pennsylvania Statute Creating Degrees of Murder,* 97 U. of Pa. L. Rev. 759 (1949); and Keedy, *A Problem of First Degree Murder: Fisher v. United States,* 99 U. of Pa. L. Rev. 267 (1950). The Act of 1794, supra, was re-enacted practically verbatim as Section 74 of the Act of March 31, 1860, P. L. 382, and, again, as Section 701 of The Penal Code of 1939, P. L. 872, 18 PS §4701.

Although degrees of murder were, and still are, unknown to the common law, three classes of homicide are there recognized. The term "homicide" is, of course, generic and embraces every killing of a human being by another: 1 Warren, Homicide, §54 (Perm. Ed.); IV Blackstone, Commentaries, *177. The classifications of homicide at common law are (1) justifiable, (2) excusable and (3) felonious. "The first has no share of guilt at all; the second very little; but the third is the highest crime against the law of nature that man is capable of committing": IV Blackstone, Commentaries, *177-178. A justifiable homicide is

---

[1] Section 919 of The Penal Code of 1939, P. L. 872, 18 PS §4919, provides that, where the wanton derailment of a railroad train results in a death, the perpetrator of the derailment is guilty of murder in the first degree and punishable accordingly: see *Commonwealth v. Johnson,* 368 Pa. 139, 81 A. 2d 569.

such as is committed either by command or, at least, with the permission of the law, e.g., execution of a convicted criminal, *apprehension of an escaping felon*, etc.; an excusable homicide is such as is committed either *per infortunium* (i.e., accidentally) or *se defendendo* (i.e., in self defense); IV Blackstone, Commentaries, *178-186; and a felonious homicide (i.e., a murder) occurs when a person of sound memory and discretion unlawfully and feloniously kills any human being in the peace of the sovereign with malice prepense or aforethought, express or implied: see IV Blackstone, Commentaries, *195; I Warren, Homicide, §63; 1 Wharton, Criminal Law, §419 (12th Ed.). Such is substantially the definition of murder which this court adopted in *Commonwealth v. Drum*, 58 Pa. 9, and which has ever since then been uniformly applied by this court in the multitude of murder trials that has followed: see, e.g., *Commonwealth v. Buzard*, 365 Pa. 511, 76 A. 2d 394.

As Blackstone expressed it, malice is the "grand criterion which . . . distinguishes murder from other killing": IV Commentaries, *198. And, yet, in certain circumstances the malice essential to murder need be neither prepense nor express. For instance, at common law an accidental or unintentional homicide committed in the perpetration of or attempt to perpetrate a felony is murder, the malice necessary to make the killing murder being constructively imputed by the malice incident to the perpetration of the initial felony. Thus, "if one intends to do another felony, and undesignedly kills a man, this is also murder": IV Blackstone, Commentaries, *200-201. This type of felonious homicide, known as felony-murder, became firmly imbedded in the common law. Expressions of the doctrine are to be found in many of the common law text writers and commentators, including Lord Coke: see

article entitled "The Killer and His Victim in Felony-Murder Cases" by Hitchler, 53 Dick. L. Rev. 3 (1948). The same author further notes that the most widely accepted explanation of the origin of the doctrine is that at early common law practically all felonies were punishable by death and that it was of no particular moment whether a man was hanged for one felony or another. However, the differentiation today in the punishments for the various felonies makes the distinction as to felony-murder vitally important. And, the trend generally has been to restrict rather than to expand application of the felony-murder doctrine. In fact, in enacting the Act of 1794, supra, the Pennsylvania legislature restricted the scope of the felony-murder rule, so far as first degree murder was concerned (i.e., the capital offense which all murder is at common law), to four specifically enumerated felonies, namely, arson, rape, robbery or burglary. The limitation so imposed by the Act of 1794 was carried over into Section 74 of the Act of 1860, supra. And, by Section 1 of the Act of May 22, 1923, P. L. 306, a fifth felony (viz., kidnapping) was added. The statute, as so amended, was later codified in Section 701 of the presently applicable Penal Code of 1939, supra.

All felony-murder other than the types specified in Pennsylvania's *degree* statute is murder of the second degree by virtue of the express terms of that statute. Neither the Act of 1794, supra, nor any of the subsequent re-enactments made *all* homicides occurring in the perpetration of felonies murder of the first degree. It was only such murder as was committed in the perpetration of the statutorily specified felonies that was made first degree murder. Logically, therefore, the initial determination of the fact of murder is to be made according to the rules of the common law, including the felony-murder theory of imputed malice,

and, upon a finding of guilt, the degree statute automatically intervenes to raise the murder to first degree if it happened to be committed in the perpetration of arson, rape, robbery, burglary or kidnapping: cf. *Commonwealth v. Kelly*, 333 Pa. 280, 284-285, 4 A. 2d 805.

The thing which is imputed to a felon for a killing incidental to his felony is *malice* and *not the act of killing*. The mere coincidence of homicide and felony is not enough to satisfy the requirements of the felony-murder doctrine. "It is necessary . . . to show that the conduct causing death was done in furtherance of the design to commit the felony. Death must be a consequence of the felony. The requirement is causation and not merely coincidence": Hitchler, loc. cit. supra, citing Perkins, *Malice Aforethought*, 43 Yale L. J. 537, 569 (1934).

The legal situation which for years obtained in this State in cases of felony-murder was aptly epitomized by Mr. Justice PARKER in *Commonwealth v. Guida*, 341 Pa. 305, 308, 19 A. 2d 98, as follows, ". . . if a person killed another in doing or attempting to do another act, and if the act done or attempted to be done was a felony, the killing was murder. There was thus supplied the state of mind called malice which was essential to constitute murder. The malice of the *initial* offense attaches to whatever else the *criminal* may do in connection therewith" (Emphasis supplied). And so, until the decision of this court in *Commonwealth v. Almeida*, 362 Pa. 596, 68 A. 2d 595 (1949), the rule which was uniformly followed, whether by express statement or by implication, was that in order to convict for felony-murder, the killing must have been done *by the defendant or by an accomplice or confederate or by one acting in furtherance of the felonious undertaking*. See, e.g., *Commonwealth v. Major*, 198 Pa. 290, 47 A. 741; *Commonwealth v. Grether*, 204 Pa. 203, 53 A. 753; *Commonwealth v. Lessner*, 274 Pa. 108, 118 A.

24; *Commonwealth v. Carelli*, 281 Pa. 602, 127 A. 305; *Commonwealth v. McManus*, 282 Pa. 25, 127 A. 316; *Commonwealth v. Lawrence*, 282 Pa. 128, 127 A. 465; *Commonwealth v. Doris*, 287 Pa. 547, 135 A. 313; *Commonwealth v. Tauza*, 300 Pa. 375, 150 A. 649; *Commonwealth v. Flood*, 302 Pa. 190, 153 A. 152; *Commonwealth v. Crow*, 303 Pa. 91, 154 A. 283; *Commonwealth v. Sterling*, 314 Pa. 76, 170 A. 258; *Commonwealth v. Bruno*, 316 Pa. 394, 175 A. 518; *Commonwealth v. Shawell and England*, 325 Pa. 497, 191 A. 17; *Commonwealth v. Stelma*, 327 Pa. 317, 192 A. 906; *Commonwealth v. Kelly*, 333 Pa. 280, 4 A. 2d 805; *Commonwealth v. Guida*, supra; *Commonwealth v. Frisbie*, 342 Pa. 177, 20 A. 2d 285; *Commonwealth v. Elliott*, 349 Pa. 488, 37 A. 2d 582; *Commonwealth v. Pepperman*, 353 Pa. 373, 45 A. 2d 35; *Commonwealth v. Wooding*, 355 Pa. 555, 50 A. 2d 328.

Until the *Almeida* case there was no reported instance in this State of a jury ever having been instructed on the trial of an indictment for murder for a killing occurring contemporaneously with the perpetration of a felony that the defendant was guilty of murder regardless of the fact that the fatal shot was fired by a third person acting in hostility and resistance to the felon and in deliberate opposition to the success of the criminal undertaking. On the contrary, in *Commonwealth v. Thompson*, 321 Pa. 327, 330, 184 A. 97, which involved a conviction of first degree murder with penalty of death, the defendant contended that the victim was killed by a bullet fired by a neighbor in an effort to resist the defendant's armed assault, while attempting to burglarize the home of the deceased victim. On appeal to this court, the defendant complained that "the trial judge did not adequately present to the jury the evidence in support of his contention that the bullet which killed [the deceased] was

fired from [the neighbor's] pistol, but reviewed at greater length and with emphasis the evidence supporting the opposite theory of the Commonwealth." In affirming the conviction, this court, after noting that no objections had been made at the close of the trial to the court's instruction in the regard indicated, said that "when the statement complained of is read with the preceding portion of his charge, it is clear that the trial judge did not intend to, and in fact, did not convey the impression that the doctor had testified the decedent died from a gunshot wound inflicted by any particular bullet or pistol. An examination of the charge in its entirety discloses *very careful instruction that the jury must be satisfied beyond a reasonable doubt that the defendant's shot caused the death"* (Emphasis supplied).

Again, in *Commonwealth v. Mellor*, 294 Pa. 339, 342, 144 A. 534, which likewise involved a first degree murder conviction with the death penalty, the major defense at trial was that the innocent victim of a shooting in connection with an attempted robbery by the defendant (and a confederate) was accidentally killed by a bullet from a revolver of a police officer attempting to repel the robbers' felonious assault. In submitting the case to the jury "the trial judge charged that, if the jurors believed [the deceased] was killed by a shot from [the policeman's] revolver, [the defendant] should be acquitted." And, this court, in an opinion by Mr. Chief Justice MOSCHZISKER, neither criticized nor repudiated the instruction.

The rule thus expressed and followed in Pennsylvania at earlier times was the same in other common-law jurisdictions and still continues so to be.

In *Commonwealth v. Campbell*, 89 Mass. (7 Allen) 541, on an indictment for murder for a homicide committed near an armory in Boston during a riot which

grew out of the enforcement of the Civil War draft, the Commonwealth's evidence showed that the defendant was participating in the riot; that a military force was called out to suppress the riot and was stationed in the armory; and that the mob was fired on by the soldiers and the soldiers were fired on by the mob. The case was tried before Chief Justice BIGELOW and Justices METCALF, MERRICK and HOAR of the Supreme Judicial Court of Massachusetts and was prosecuted by the Attorney General of the State in person. The Attorney General requested the court to instruct the jury as follows: "That whether [the deceased] was killed by a shot from within or without the armory, all the parties unlawfully engaged in the transactions which resulted in the homicide were at common law guilty, at least of manslaughter." The instruction was refused in an opinion for the court by Chief Justice BIGELOW who said in part (pp. 544-545), *"No person can be held guilty of homicide unless the act is either actually or constructively his, and it cannot be his act in either sense unless committed by his own hand or by some one acting in concert with him or in furtherance of a common object or purpose.* Certainly that cannot be said to be an act of a party in any just sense, or on any sound legal principle, which is not only not done by him, or by any one with whom he is associated or connected in a common enterprise, or in attempting to accomplish the same end, but is committed by a person who is his direct and immediate adversary, and who is, at the moment when the alleged criminal act is done, actually engaged in opposing and resisting him and his confederates and abettors in the accomplishment of the unlawful object for which they are united. Suppose, for example, a burglar attempts to break into a dwelling-house, and the owner or occupant, while striving to resist and prevent the unlawful entrance,

by misadventure kills his own servant. Can the burglar in such case be deemed guilty of criminal homicide? Certainly not" (Emphasis supplied). Coming to the facts of the particular case, Chief Justice BIGELOW said (pp. 547-548) that, "If the homicide was the result of a shot fired by the soldiers or other persons in the armory, acting together in defence against the riotous assembly, the defendant cannot be held guilty of either murder or manslaughter. *The jury will accordingly be instructed that, unless they are satisfied beyond a reasonable doubt that the deceased was killed by means of a gun or other deadly weapon in the hands of the prisoner, or of one of the rioters with whom he was associated and acting, he is entitled to an acquittal*" (Emphasis supplied).

In *Butler v. People*, 125 Ill. 641, 18 N.E. 338, William and Franklin Butler, with two other persons, were charged with murder for the killing of an innocent bystander by a shot fired by the town marshall in his effort to suppress the rowdy conduct of the Butlers and their companions. Citing *Commonwealth v. Campbell*, supra, as a case in point, Chief Justice CRAIG, speaking for the Supreme Court of Illinois, said that ". . . we know of no well-settled rule of law which would hold the defendants liable for the acts of [the town marshall]. They would be responsible for what they did themselves, and such consequences as might naturally flow from their acts and conduct; but they never advised, encouraged, or assented to the acts of [the town marshall], nor did they combine with him to do any unlawful act, nor did they in any manner assent to anything he did, and hence they could not be responsible for his conduct toward the deceased." The rowdyism of the Butlers and their companions was a misdemeanor and not a felony. But, the principle involved is the same so far as the defendants' criminal

responsibility for the marshal's unintentional killing of an innocent third person was concerned. At common law, a homicide committed by one acting in furtherance of a misdemeanor (at least one *malum in se*) is, by like token, voluntary manslaughter (see I Warren, Homicide, §74), malice not being imputable, the offense not being a felony. And, voluntary manslaughter was the crime whereof the Butlers were convicted. However, the Supreme Court of Illinois reversed the judgments for the reasons above quoted, viz., that criminal responsibility is not imputable to a wrongdoer for the homicidal effect of a resisting officer's accidental or unintentional killing of an innocent bystander.

In *Commonwealth v. Moore,* 121 Ky. 97, 88 S.W. 1085, the defendants, Moore and Kelly, assaulted *John* Young with the intent to rob him. Young drew a gun with which to defend himself, discharged it and accidentally killed *Anderson* Young, an innocent bystander. Just as here, the indictment for murder was dismissed by the trial court and the Commonwealth appealed. The Kentucky Court of Appeals cited approvingly the cases of *Commonwealth v. Campbell* and *Butler v. People,* supra, quoting from what it termed the "learned opinion of the Supreme Court of Massachusetts" in the *Campbell* case, and affirmed the dismissal of the indictment, saying in support of its action, "Here the homicide was not committed by the conspirators, either in the pursuance of the conspiracy or at all; but it was the result of action on the part of John Young, the proprietor of the house, in opposition to the conspiracy, and entirely contrary to the wishes and hopes of the conspirators. *In order that one may be guilty of homicide, the act must be done by him actually or constructively, and that cannot be, unless the crime be committed by his own hand, or by the hands of some one acting in concert with him, or in furtherance of a com-*

*mon object or purpose.* The defendants can in no sense be said to have aided or abetted John Young, for he was firing at them; and to hold them responsible criminally for the accidental death of a bystander, growing out of his bad aim, would be carrying the rule of criminal responsibility for the acts of others beyond all reason. *Suppose, instead of killing an innocent bystander, Young* [the victim of the robbery] *had killed Moore, one of the robbers; would the survivor have been guilty of murder?* And yet, if the principle sought to be maintained by the Commonwealth be sound, the survivor would necessarily be guilty of murder, because the owner of the house to be robbed had killed his companion; for he could just as truly be said to have aided and abetted the owner of the house in that case as in this" (Emphasis supplied).

In *State v. Oxendine*, 187 N.C. 658, 122 S.E. 568, on an indictment for murder, the deceased, a bystander, was accidentally shot by a man defending himself against an attack by the defendants. A general verdict of guilty of manslaughter was returned as to all defendants. On appeal by one of them (Oxendine), the Supreme Court of North Carolina, in reliance upon the *Campbell, Butler* and *Moore* cases, supra, reversed the conviction on the ground that "Walter Oxendine [the appellant] and Proctor Locklear [the man who fired the fatal shot] were not acting in concert; they were adversaries, and it is the general rule of law that a person may not be held criminally responsible for a killing unless the homicide were either actually or constructively committed by him; and, in order to be his act, it must be committed by his own hand, or by someone acting in concert with him, or in furtherance of a common design or purpose."

In *People v. Udwin*, 254 N.Y. 255, 172 N.E. 489, some escaped convicts were indicted for the murder

of one of their number who was shot and killed in attempting to escape. In New York, escape from prison is a felony and any killing committed during the perpetration of a felony is first degree murder. Evidence as to who fired the fatal shot was circumstantial. The defendants were convicted of murder in the first degree. On appeal, the defendant, Udwin, contended that the evidence did not exclude all reasonable possibilities that the fatal shot was fired by someone other than one of the conspirators. The Court of Appeals approved "the law of the case as stated by the trial justice" who had charged that it was the burden of the prosecution to establish "beyond a reasonable doubt that the shot which killed [the deceased] was fired by one of the convicts engaged with the defendants, or some of them, in a common purpose or design to unlawfully and feloniously escape." The defendants were convicted; and, the question on the appeal was whether the evidence was sufficient to justify the verdict. By a process of elimination, the Court of Appeals found *conclusively* from the evidence that the shot which killed the deceased could have been fired *only* by one of the escaping convicts. It is implicit in the opinion that a contrary finding would have required a reversal of the convictions.

A case such as the supposititious illustration of the *Moore* case, supra, did actually arise, viz., where surviving robbers were charged with the murder of an accomplice who had met his death, during the course of the robbery, at the hands of a person unknown: see *People v. Garippo*, 292 Ill. 293, 127 N.E. 75. In that case, one Scalzitti, along with the defendants, had engaged in a highway robbery. During the progress of the robbery, Scalzitti, the leader, was shot and killed. *The trial judge submitted the case to the jury on the basis that a death having occurred in the course of the*

*robbery, all of the robbers were alike guilty of the homicide.* The defendants were found guilty of manslaughter. On the defendants' appeals, the Supreme Court of Illinois, after discussing and quoting with approval from the *Campbell, Butler* and *Moore* cases, supra, reversed the convictions, holding that "Under the reasoning of the above authorities, instructions 16 and 19 given on behalf of the State and complained of by counsel for plaintiffs in error must be held erroneous. Under those instructions, plaintiffs in error might be held responsible for shooting done by another person when there was no concert of action between him and them."

The rule long recognized and sedulously applied by the courts of this country, of which the *Campbell, Butler* and *Moore* cases, supra, are notable illustrations, is aptly stated in 13 Ruling Case Law at pp. 753-754 as follows: "Thus, where persons conspire together to commit robbery, and while carrying out such conspiracy, their victim, in self-defense, discharges a firearm at his assailants, and accidentally kills a bystander, the conspirators are not guilty of a homicide." To say, as has been suggested, that the cases above cited and discussed are the only decisions so holding affords only a specious implication. The fact is that there is no decision in any State of the Union, or in England, holding to opposite effect, so far as my research has disclosed, except for this court's decision in *Commonwealth v. Almeida.* Certainly, no such case has been brought to our attention.

It would seem to be clear beyond cavil that the ruling in the *Almeida* case was a judicial extension of the felony-murder doctrine. Such being its status, application of the ruling should be restricted to facts similar to those to which it was applied, viz., the killing of an innocent person by another innocent person as a result of indiscriminate gun fire on a busy public

thoroughfare incidental to the attempted frustration and apprehension of armed robbers seeking to flee the scene of their felony. A consonant limitation of the *Almeida* decision is especially indicated in view of the tenuous grounds upon which it was based.

At the trial of the *Almeida* case, the court charged the jury that it was immaterial to a conviction for first degree murder (the defendant having been engaged in a robbery at the time of the killing) that neither the defendant nor an accomplice had fired the fatal shot. This instruction relied for its authority on a dictum in *Commonwealth v. Moyer and Byron,* 357 Pa. 181, 53 A. 2d 736. Thereafter, this court, in affirming Almeida's conviction of first degree murder, declared that an accidental or unintentional killing occurring during the perpetration of a robbery rendered those feloniously engaged in the robbery guilty of murder in the first degree even though the fatal wound was not inflicted by any one of the felons or any one acting in their behalf or in furtherance of the felonious undertaking. The rationale of this pronouncement lay in an adaptation of the doctrine of proximate cause (as known to the law of torts) to the common-law requirement of causation in its relation to responsibility for a felony-murder. Thus, the opinion for the court specifically avowed that "Our decision in the *Moyer-Byron* case was an application of the long established principle that he whose felonious act is the *proximate* cause of another's death is *criminally* responsible for that death and must answer to society for it exactly as he who is *negligently* the *proximate cause* of another's death is *civilly* responsible for that death and must answer in damages for it." As we have already seen, the "causation" requirement for responsibility in a felony-murder is that the homicide stem from the commission of the felony. Obviously, the assumed analogy

between that concept and the tort concept of proximate cause is not conclusive. If it were, then the doctrine of superseding cause, which, for centuries, courts have recognized and rendered operative on questions of proximate cause, would have to be considered and passed upon by the jury. But, that qualification, the *Almeida* case entirely disregarded.

Beyond that, the statement in the opinion for the court in the *Almeida* case that "Our decision in *Commonwealth v. Moyer and Byron*, supra, is authority for our decision in this case" was without justification. The expression in the *Moyer* and *Byron* opinion to which the *Almeida* opinion thus alluded was that "A man or men engaged in the commission of such a felony as robbery can be convicted of murder in the first degree if the bullet which causes death was fired not by the felon but by the intended victim in repelling the aggressions of the felon or felons." That statement was a palpable dictum as an examination of the record in the *Moyer* and *Byron* case will at once disclose.

At the trial of Moyer and his confederate, Byron, the court, in its general charge, submitted the case to the jury on the basis that, in order to convict, the jury would have to find, beyond a reasonable doubt, that *either one or the other of the defendants fired the bullet which killed Zerbe, the innocent gasoline station attendant,* whose felonious killing was the subject-matter of the indictment. More than that, the court affirmed the defendants' second point for charge which was as follows: "The defendant is entitled to an acquittal unless the commonwealth has produced evidence of such a quality as to prove beyond a reasonable doubt that the bullet causing the death of the deceased was fired from the gun of either of the defendants." And, at the conclusion of the charge and the reading of the affirmed points to the jury, the trial judge, at the in-

sistence of counsel for the defendants, reiterated verbatim this requested instruction to the jury. Not one of the twenty-two reasons filed by Moyer and Byron in support of their identic motions for a new trial charged the trial judge with any error in regard to his instructions to the jury concerning what was necessary for the jury to find as to the firing of the fatal shot before the defendants could be convicted of murder. And, the district attorney nowhere argued or even intimated that the learned trial judge had charged the jury more favorably to the defendants than he should have. The actual fact is the contention that it was *immaterial* who fired the fatal shot was never raised by the Commonwealth in the court below nor could the defendants have charged error in such regard in view of the trial judge's cognate instructions. Consequently, the point required no discussion by this court. What was said in the *Moyer* and *Byron* opinion in such connection was, therefore, no more than an expression of the writer's individual view concerning a matter *coram non judice*. The jury's verdict in the light of the trial court's charge can be taken to mean only that the fatal bullet was fired by one of the felons.

The decision in the *Moyer* and *Byron* case was in no sense authority for the ruling in *Almeida*. And, the same can be said for the decisions in *Commonwealth v. Guida, Commonwealth v. Doris* and *Commonwealth v. Sterling,* cit. supra. In each of those cases the death-dealing act was committed by one participating in the incidental felony. The cases of *Commonwealth v. Phillips,* 372 Pa. 223, 93 A. 2d 455, and *Commonwealth v. Lowry,* 374 Pa. 594, 98 A. 2d 733, which have lately been advanced as having reaffirmed the ruling in *Almeida* are not presently germane. Neither of those cases was in any way related to or dependent upon the decision in the *Almeida* case. In the *Phillips* case, the

defendant pleaded guilty to a charge of murder, actually admitting that he himself had fired the fatal bullet, while in the *Lowry* case the evidence supported a finding by the jury that the defendant was the co-conspirator of the felon who fired the fatal shot. Patently, neither of these cases involved the rationale of the *Almeida* case.

The out-of-State cases cited and relied on in the *Almeida* opinion were equally not in point. For example, in the so-called "shield" cases, i.e., where a felon uses the interposition of the body of an innocent person to escape harm in flight from the scene of his crime,[2] the malice is *express*. In not one of those cases was malice imputed. Consequently, they did not involve the felony-murder theory. Indeed, the courts which decided those cases expressly recognized the validity of the principles enunciated in the *Campbell*, *Butler* and *Moore* cases, supra, but found such principles not pertinent because the factual situations then involved (viz., the use of an innocent person as a shield or breastwork against the hostile bullets of an adversary) supported findings of *express* malice. And, that was so regardless of whether the motive of the felons, in placing the innocent victim in a position of danger, was to protect themselves from shots fired at them or to induce their adversaries not to shoot at all.

Nor does *Commonwealth v. Bolish,* supra, justify the majority's present decision. In that case, Flynn, for whose death Bolish was indicted for murder, died from severe burns received while committing arson with the use of an inflammable liquid and an electric

---

[2] *Keaton v. State*, 41 Texas Crim. 621, 57 S.W. 1125, *Taylor v. State*, 41 Tex. Cr. R. 564, 55 S.W. 961, and *Wilson v. State*, 68 S.W. 2d 100 (Ark.).

hot plate furnished by Bolish for the purpose of setting the fire. According to the evidence, Flynn was either (1) an accomplice of Bolish who allegedly had planned the arson or (2) he was Bolish's pliant dupe acting directly under Bolish's influence and domination. Thus, malice essential to charging Bolish with murder was present either, *by imputation* (i. e., felony-murder), because the death occurred as a result of an act of the defendant's confederate (Flynn) while furthering the conspiracy or, *expressly,* because Bolish ordered his dupe to perform an act of known great danger threatening grievous bodily harm.

Acceptance of the decision in the *Almeida* case as being declaratory of the law applicable to the facts of that case need not require that every death occurring concurrently with the commission of a felony makes the felons guilty of murder even though none of them inflicted the fatal wound. So to limit the *Almeida* ruling is necessary for the protection of the liberties of the people generally by insuring that no one can be convicted of crime and punished other than as the competently established law ordains and not merely by judicial ipse-dixitism. If it should be deemed essential to the public safety and security that felons be made chargeable with murder for *all* deaths occurring in and about the perpetration of a felony—regardless of who inflicted the fatality—the legislature should be looked to for appropriate exercise of the State's sovereign police power to an end never yet legislatively enacted.

The ruling of the majority in the instant case goes far beyond the holding in the *Almeida* case. Here, Jackson, the deceased, forfeited any right to the law's protection when he entered upon his armed aggression against a peaceful citizen who, in killing Jackson, acted throughout with the permission, if not at the command, of the law. Observe the absurd situation brought about

by constructively making Thomas the killer. If such he be, then he performed a justifiable act. He cut down in his tracks a felon who, at the very moment of his death, was murderously assaulting a blameless citizen who was protecting his life and property. On the basis of the majority's constructive-killer theory, Thomas should be commended, and not condemned, for the lawful dispatch of the armed robber, Jackson, by way of a justifiable homicide.

I would affirm the order of the court below sustaining the defendant's demurrer.

Mr. Justice CHIDSEY joins in this dissent.

---

DISSENTING OPINION BY MR. JUSTICE MUSMANNO:

On April 1, 1954, Henry Thomas, Jr., and Henry Jackson, Jr., invaded the grocery store of Frederick Cecchini in Philadelphia for the purpose of committing a robbery. Jackson held a revolver while Thomas rifled the cash register and then they both fled. The proprietor Cecchini seized a pistol from behind a counter and shot at Jackson who returned the fire. In the ensuing running gun battle Cecchini killed Jackson. The surviving robber Thomas was later apprehended and indicted for murder under the Act of June 24, 1939, P. L. 872, §701; 18 P.S. 4701, which provides, inter alia, that "(a) All murder . . . which shall be committed in the perpetration of . . . any . . . robbery . . . shall be murder in the first degree."

After the Commonwealth had presented its evidence at the trial, the defendant demurred by contending that the facts did not make out first degree murder under the cited statute. The Court sustained the demurrer and the Commonwealth appealed. The Majority of this Court has reversed the judgment and ordered a new trial on the charge of murder.

There can be but little doubt, of course, that Henry Thomas committed robbery, but I do not see how he can be charged with murder. The statute under which Thomas has been indicted specifically states that "all *murder* which shall be committed in the perpetration of any robbery shall be murder in the first degree." The killing of Jackson was not in the remotest degree murder. It was justifiable homicide. Cecchini not only had the right but he was compelled to kill Jackson on two counts: (1) in self defense; (2) to prevent the escape of a fleeing felon. How can such a legal act be the basis of a charge of murder?

If Jackson had actually taken his own life at the scene of the robbery, or immediately thereafter, could Thomas be indicted for murder? According to the agreed statement of facts, Thomas and Jackson separated after leaving Cecchini's store. Jackson ran west and Thomas ran east. While fleeing in the opposite direction from his accomplice, Jackson on his own engaged Cecchini in a battle and lost his life as the result of his own homicidal aggressiveness. To hold Thomas then for the act of Jackson who brought about his own death as much as if he had shot himself, is, as I view the matter, absolutely insupportable in the law books or in any classroom of serious discussion.

The obvious intent of the Act of 1939 was to punish with the severest possible penalty all those engaged in robbery if, during the unfolding of the robbery or escape therefrom, some innocent person was killed. The individual killed here was not an innocent person, he was not a victim; he was one of the perpetrators of the robbery. He was killed not during the furtherance of the robbery, but while the victim himself was trying to prevent the robbery.

One could conclude from the Majority Opinion that since Thomas was a robber, society is justified in kill-

ing him. But any penalty which goes beyond what the law specifically prescribes for a certain offense is an assault on the majesty and the dignity of the law itself. Society is not benefited when the norms of established procedure are exceeded by those charged with upholding them. If the sovereign power of the Commonwealth believes that robbers should be put to death, the Legislature should enact a statute to that effect. But until the General Assembly so speaks, this Court or any other Court has no right to read into the statute what is not there. As the Superior Court well said it in the case of *Com. ex rel. Green v. Keenan*, 176 Pa. Superior Ct. 103, 106: "The legislature has exclusive power to determine the penological system of the Commonwealth, and it alone can prescribe the punishments to be meted out for crime."

With all the will in the world to wish otherwise, I can only see in the Majority's Opinion an arbitrary exercise of power arising out of a zeal to combat criminals, which zeal does not surpass that of this writer's. However, zeal must be channeled into the ways of the law as *written*. Although the Majority Opinion covers some 1200 words it never succeeds in explaining how the word "murder" in the Act of 1939 can be made to mean anything else. In fact at the end it practically concedes its arbitrariness when it says that Jackson's death "was a *killing* in the perpetration of a robbery." I repeat that the statute says: "*Murder* which shall be committed in the perpetration of any robbery shall be murder in the first degree." It does not say "killing." If the Majority can torture the word "murder" into the word "killing," then why may not manslaughter be read as assault and battery, why may burglary not become larceny and what is to hinder the interpretation of arson as malicious mischief? The Court has the power to do this, but with such abandonment to

legalistic malapropism, it is inevitable that the whole criminal code will soon be awash in a verbal Sargasso Sea.

The defendant Thomas as an individual may be of little importance in the forum of intellectual argumentation which this case has created. It is to be regretted that there should not be a more worthy subject to save, but robber and criminal as Thomas undoubtedly is, he still may not be used as a target for illegal punishment. I do not want to see this highest court in our Commonwealth use processes of reasoning which do not respond to the demands of fair play which is part of the American way of life. I make a plea in this Dissenting Opinion for legal common sense. It is gratifying to note that the lower Court was not thrown into a panic by the problem which the situation presented. Its powers of reflection were not routed by the forces of emotion. It courageously held the line of reason at the Thermopylae of logic and did not retreat at the Gettysburg of fact.

But the Majority here retreats from logic, abandons precedent, and treats the words of a very clear statute as empty vessels into which any meaning may be poured. But such a procedure is to martyrize the dictionary and to make of the science of language a haphazard aggregation of loose-jointed syllables.

I protested against the decision in the case of *Commonwealth v. Bolish,* 381 Pa. 500 where this Court only several months ago decided that the defendant there could be tried for murder in the first degree because his confederate was killed in an accidental explosion at the locale of the crime of arson even though Bolish was nowhere near the incendiary fire. I regarded that decision as a most unwise one and I still think so, but the hole in the dike of the law on this subject made by the pronouncement in that case is now

widening into a full break, and blind vengeance pours through the break, indifferent to reason and justice.

Nor does the *Almeida* case, which the Majority quotes, justify what is being done here. In that famed case a policeman who was engaged in the endeavor to restrain and capture some robbers was shot accidentally by another policeman. Almeida, one of the robbers, was properly tried and convicted of murder on the felony-murder doctrine because his participation in the robbery encompassed the possibility of injuring or even killing innocent persons. Pointing out that the proximate cause of the policeman's death was the robbery, this Court said: "The principle of proximate cause in criminal cases was applied by one of the ablest of Pennsylvania nisi prius judges 105 years ago, to wit, President Judge KING, in the case of Commonwealth v. Hare, 2 Pa. L. J. 467 (1844). Two separate bodies of men were fighting each other with firearms in a public street and as a result a citizen was killed. Judge KING held that the members of both bodies of men were guilty of felonious homicide . . . . President Judge KING instructed the jury, inter alia, as follows: 'If during such a scene of unlawful violence an innocent third person is slain, . . . such a homicide would be murder at common law . . . and all participants in such an act are alike responsible for its consequences . . . . *Shall the violators of the public peace, whose unlawful acts have produced the death of the unoffending, escape, because from the manner and time of the fire it is impossible to tell from what quarter the implement of death was propelled? Certainly not . . . .*'" *Commonwealth v. Almeida*, 362 Pa. 596, 606.

It will be noted that the Court speaks of the victim as an "innocent third person" or an "unoffending" person. But in the instant case Jackson was not an innocent third person, nor was he an unoffending per-

son. He was one of the robbers! And he was killed. If it were possible to try a dead man, Jackson himself, under the theory announced by the Majority, should he be tried for his own murder!

In the case of *Commonwealth v. Moyer*, 357 Pa. 181, this Court quoted from Bishop on Criminal Law as follows: " '*A man may be guilty of a wrong which he did not specifically intend, if it came naturally or even accidentally through some other specific or a general evil purpose* . . . *"One is responsible for what wrong flows directly from his corrupt intentions* . . ." ' " (p. 194).*

But there was no wrong in Jackson's death. Shooting Jackson was right, and therefore *that* killing, without assuming the most farcical position, cannot possibly form the basis of a murder charge.

This Court said also in the *Almeida* case: "If Mrs. Ingling [the widow of the deceased policeman] should bring an action . . . for causing the death of her husband there is no doubt of her ability to recover a judgment against them."

That observation, of course, is logical and just, but could anything be more absurd than Mrs. Jackson in the case at bar bringing a tort action against Thomas for the death of her husband who was not only tainted with the robbery he had committed but whose hands were stained with the murder he was attempting? *That* is the difference between the *Almeida* case and the present case.

The State of California recently passed on the very question we are here considering. In the case of *People v. Ferlin*, 265 P. 2d 230, 234-5, one Fisher and one Skala conspired to commit arson. In the perpetration of their crime, Skala was accidentally killed. Ferlin was then tried for murder on the felony-murder theory

* All italics, mine.

and was convicted. But the Supreme Court of California reversed the verdict saying: "It cannot be said from the record in the instant case that defendant and deceased had a common design that deceased should accidentally kill himself. Such an event was not in furtherance of the conspiracy, but entirely opposed to it. It follows that the verdict of the jury finding the defendant guilty (of murder) . . . was against the law." What the California Supreme Court said above applies to the facts in the case before us. As I have already stated, the killing in this case was not in furtherance of the robbery, "but entirely opposed to it."

The crime situation in the United States is admittedly a grave one and all forces of the law, including the judiciary, have a duty to exert every effort to vanquish criminals. But what the Majority is doing here is grotesque. It is investing the dead Jackson with virtues of good citizenship. It completely ignores that Jackson was a robber, a felon, a would-be murderer, an armed member of the criminal forces the nation is combatting. He was seeking to destroy Cecchini, an admittedly good citizen. But Cecchini turned the tables on him and Jackson made his exit in true bandit fashion, shooting it out with the law. To use this felon's death as the basis for the charge of constructive murder is to turn the drama of a murder trial into a legalistic vaudevillian performance.

The whole theory of the criminal law is to punish for what *should not have happened*. In every prosecution for murder the controlling principle of the Commonwealth's case is that the dead victim should be alive. The rationalization behind criminal jurisprudence is that if society could turn back time, it would prevent the happening of the event which it now condemns. But if that chronological miracle could be achieved in this case, society would not desire to pre-

vent the killing of Jackson, who received his just deserts as he was engaged in trying to kill an innocent person.

There has never so far as I have been able to discover until this case a prosecution for murder that was not based on the proposition that the victim had the right to live and therefore the defendant is to be punished for having untimely cut off the days of that victim. The killing which is the subject of every murder trial represents evil. But in this case we have the startling situation of the law seeking to punish not evil but good. The killing of Jackson was not evil, it was not even excusable homicide; it was a killing which the law demanded. How can anyone be punished for what the law required? If the reasoning adopted by the Majority in the disposition of this case were to be carried to its ultimate development, it would mean that everyone connected with a robbery should be executed if one of the robbers went to the electric chair, because that in itself is a killing.

Should the Courts be placed in the preposterous situation of trying a murder case where no murder was committed?

I dissent.